IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

―――――――――――

No. 98-40440

―――――――――――

PATRICIA D. SKIDMORE,

Plaintiff-Appellee,

v.

PRECISION PRINTING AND PACKAGING, INCORPORATED;
ANHEUSER BUSCH COMPANIES, INC.; JAY MITCHELL,

Defendants-Appellants.

―――――――――――――――――――――――

Appeal from the United States District Court
for the Eastern District of Texas

―――――――――――――――――――――
September 13, 1999

Before GARWOOD, DUHÉ, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

Appellants Precision Printing & Packaging, Inc.
("Precision") and its parent, Anheuser-Busch Companies, Inc.
("Anheuser-Busch"), appeal judgments against them for intentional
infliction of emotional distress and violation of Title VII.
Appellant Jay Mitchell appeals a judgment against him for
intentional infliction of emotional distress.  We vacate the
judgment against Mitchell, reverse all judgments against
Precision and Anheuser-Busch, and reverse the award of attorneys'
fees.

I. *Background*

Appellee Patricia Skidmore[1] began working for the Paris, Texas facility of Precision in 1990. In fall 1994, Skidmore took a position in Precision's cutting department, where she was assigned to work as an inspector-packer on a flexographic machine. Appellant Mitchell was employed as the operator of the flexographic on the same shift as Skidmore. Although Mitchell oversaw the operation of the machine, Skidmore's direct supervisor at the company was Jim Bryan. The cutting department supervisors, including Bryan, observed workers either from an observation post overlooking the department floor or by walking around the machines.

Skidmore testified that Mitchell harassed her with constant sexual remarks, invited her to his house for a "hot body oil massage," told her to undress so he could lick her from head to toe, asked her to leave her husband and have his child, followed her after work, asked her to go to Las Vegas with him, and sometimes came up behind her and licked or kissed her face or neck. Skidmore further testified that Mitchell once put his

---

1. Sometime after the events that gave rise to this case, Skidmore remarried and took the name Patricia Slagle. For convenience, we refer to her as "Skidmore" throughout this opinion.

hands around her neck as if to choke her when she confronted him about his behavior. Mitchell testified that he had a good working relationship with Skidmore and that although he did joke around with her, he never sexually harassed her.

On January 30, 1995, Bryan learned of an argument in a break room between Skidmore and another employee, Freddy Cooke. According to trial testimony, Patricia Skidmore's then husband, Curtis, had telephoned Cooke after hearing a rumor that his wife was having an affair with Mitchell. Patricia Skidmore became angry with Cooke for not denying the existence of the affair or explaining to Curtis Skidmore how Mitchell was harassing Patricia Skidmore. After learning of the disturbance in the break room, Bryan met with Skidmore in his office. Skidmore told Bryan that Mitchell was bothering her and that his behavior was contributing to problems in her marriage. Bryan testified at trial that this was his first notice of the alleged harassment.

Immediately after talking with Skidmore, Bryan moved her to a warehouse facility for the rest of the week and instructed Mitchell to stay away from her. Three days later, Bryan returned Skidmore to the cutting department but no longer assigned Skidmore to work the same shift as Mitchell, with the exception of several days that she spent training her replacement on the flexographic. Testimony at trial revealed that although Bryan considered the January 30 conversation with Skidmore to be a

-3-

complaint about sexual harassment, he did not conduct an investigation or interview Skidmore's co-workers until after Skidmore filed an EEOC complaint three months later. Skidmore alleges that Mitchell's harassment abated after the January 30 incident but did not end: on one occasion, Mitchell "leered" at her and his presence in common work areas (for instance, the break room) made her feel uncomfortable. Skidmore concedes that he did not touch her or say anything offensive to her again. Skidmore also testified that rumors about her sexual harassment complaint circulated around the office and caused other employees to ostracize her. Following a maternity leave later that year, Skidmore quit Precision.

Skidmore testified that, as a result of the harassment, she lost weight, had anxiety attacks, and suffered from headaches, vomiting, and nightmares. She visited a psychologist soon after the incidents but stopped when it became too expensive. Skidmore's attorney later referred her to a psychiatrist, Dr. Roger House, who diagnosed her with post-traumatic stress disorder and recommended a year or more of psychiatric treatment.

Skidmore filed this suit against Precision, Anheuser-Busch, and Mitchell, alleging sexual harassment and retaliation in violation of Title VII, as well as state law claims of assault and battery, intentional infliction of emotional distress, and negligent supervision. The district court granted summary judgment to Precision and Anheuser-Busch on Skidmore's assault

and battery claim, finding insufficient evidence that they ratified any conduct by Mitchell that could be construed as assault and battery. The district court also granted summary judgment to Precision and Anheuser-Busch on Skidmore's negligent supervision claim and summary judgment to Mitchell on Skidmore's Title VII claim. The remaining claims proceeded to trial before a jury. The Appellants moved for judgment as a matter of law before the case was submitted to the jury. The district court denied the motion.

The jury found Precision and Anheuser-Busch liable for violating Title VII with willful or reckless disregard for Skidmore's rights. It set punitive damages against Precision and Anheuser-Busch on this charge at $10,000. The jury found that Precision and Anheuser-Busch did not retaliate against Skidmore for her complaints.

The jury found that Mitchell did not commit assault and battery against Skidmore but did cause intentional infliction of emotional distress and in doing so acted with malice, willfulness, or callous and reckless disregard. The jury set punitive damages against Mitchell at $10,000 on this charge. The jury found that Precision and Anheuser-Busch ratified Mitchell's intentional infliction of emotional distress but did not act with malice, willfulness, or callous and reckless disregard. The jury set punitive damages against Precision and Anheuser-Busch at $10,000 on this charge.

The jury determined that Skidmore should not receive compensation for lost wages or benefits.  The jury set compensatory damages at $20,000 for mental anguish and emotional distress and $10,000 for past and future medical expenses.

The district court entered judgment in favor of Skidmore. It held Mitchell, Precision, and Anheuser-Busch liable, jointly and severally, for $30,000 in compensatory damages.  It awarded the jury's recommended punitive damages of $20,000 against Precision and Anheuser-Busch and $10,000 against Mitchell.

The district court later entered an order for attorneys' fees in the amount of $86,013.65 and for expenses in the amount of $7,624.70, to be paid by Precision and Anheuser-Busch.

Thereafter, the district court denied the Appellants' Rule 50(b) and Rule 59 motions.

## II. *Claim Against Jay Mitchell*

Appellant Jay Mitchell argues that the district court erred in finding that there was sufficient evidence to support Skidmore's claim for intentional infliction of emotional distress.  Under Federal Rule of Civil Procedure 50(b), a party is entitled to judgment as a matter of law when the facts and inferences point so strongly in that party's favor that no reasonable jury could reach a contrary verdict.  *See* Fed. R. Civ. P. 50(b).  We review de novo a district court's decision whether to grant judgment as a matter of law under Rule 50.  *See Nichols*

-6-

*v. Lewis Grocer*, 138 F.3d 563, 565 (5th Cir. 1998).  Mitchell further argues that the jury received an incorrect instruction regarding intentional infliction of emotional distress.  We agree with the district court that Skidmore presented sufficient evidence to support her claim against Mitchell, but we vacate the award on the basis of the improper instruction.

A.    *Sufficiency of the Evidence*

In *Wilson v. Monarch Paper Co.*, 939 F.2d 1138 (5th Cir. 1991), this Court set forth in detail the elements of a claim for intentional infliction of emotional distress under Texas law. First, a plaintiff must show that the defendant acted intentionally or recklessly.  Second, she must show that the defendant's conduct was "extreme and outrageous": "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious.'" *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989) (quoting Restatement (Second) of Torts § 46 cmt. d).  Mere violation of laws regulating conduct in the workplace is not enough to establish intentional infliction.  *See Wilson*, 939 F.2d at 1143-44; *Sebesta v. Kent Electronics Corp.*, 886 S.W.2d 459, 463-64 (Tex. App.--Houston [1st Dist.] 1994, writ denied); *see also Johnson v. Merrell Dow Pharmaceuticals, Inc.*, 965 F.2d 31, 33 (5th Cir. 1992) ("[A] claim for intentional infliction of emotional distress will not lie for mere 'employment

disputes.'"). "[T]he level of atrociousness to which [the behavior] must [rise] is quite high. Simply put, it must exceed all possible bounds of decency and be utterly intolerable in a civilized society." *Franklin v. Ensearch, Inc.*, 961 S.W.2d 704, 710 (Tex. App.--Amarillo 1998, n.w.h.). Third and fourth, the plaintiff must show that the actions of the defendant caused the plaintiff to suffer emotional distress and that the distress was severe. *See Wilson*, 939 F.2d at 1142; *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex. 1993).

Mitchell argues that his conduct lacked the requisite degree of outrageousness. There is no litmus test for outrageousness; whether conduct was outrageous and extreme must be analyzed on a case-by-case basis. Some employment settings "'contemplate a degree of teasing and taunting that in other circumstances might be considered cruel and outrageous.'" *Wilson*, 939 F.2d at 1143 (quoting Keeton et al., *Prosser & Keeton on Torts* (5th ed. 1984 & 1998 Supp.)). The employment context in this case was a manufacturing facility, a casual workplace in which, according to trial testimony, employees frequently joked and kidded with one another. Nonetheless, the jury could reasonably have found that Mitchell's behavior exceeded the bounds appropriate in even a relaxed workplace, going well beyond unwanted sexual advances in the workplace. When viewed favorably to Skidmore, the evidence showed that Mitchell subjected her to sexually suggestive

touching, including kissing her neck and pulling her waist to his if she bent over; that Mitchell made constant sexual remarks, including suggesting that Skidmore allow him to lick her from head to toe or accompany him home for a "hot body oil massage"; that Mitchell laughed at Skidmore's reactions to his uninvited harassment; that Mitchell, telling Skidmore that her husband did not treat her well, asked Skidmore to leave her husband for Mitchell; and that Mitchell, even knowing that false rumors of a sexual relationship between him and Skidmore had reached Skidmore's husband and threatened her marriage, did not deny the relationship. Mitchell's improper conduct was persistent and long-standing. This evinces a course of conduct intentionally designed to inflict emotional distress upon Skidmore that is so severe, pervasive, and outrageous as to constitute the state law claim advanced by Skidmore. Accordingly, we cannot say that the jury verdict against Mitchell for intentional infliction of emotional distress was wholly unsupported. *Cf. GTE Southwest, Inc. v. Bruce*, 1999 WL 450707, at *11 (Tex. July 1, 1999) (finding that a supervisor who "regularly assaulted, intimidated, and threatened" his subordinates engaged in extreme and outrageous conduct); *Soto v. El Paso Natural Gas Co.*, 942 S.W.2d 671, 681 (Tex. App.--El Paso 1997, writ denied) (reversing a grant of summary judgment for an individual employee because his derogatory remarks about a female co-worker's cancer-related

mastectomy raised a fact issue regarding intentional infliction of emotional distress).

Mitchell next argues that Skidmore failed to present any evidence that she suffered severe emotional distress. Skidmore testified that, following the harassment, she lost weight, experienced anxiety attacks, had headaches and nightmares, and became depressed. She also proffered the testimony of Dr. Roger House, a psychiatrist, who testified that Skidmore suffers from post-traumatic stress disorder. This is sufficient evidence of severe emotional distress if the jury chose to credit the testimony.

B.  *Jury Instructions*

Nonetheless, despite the sufficiency of Skidmore's evidence, we must vacate the verdict against Mitchell. We vacate an award if the jury charge "'as a whole leaves . . . substantial and ineradicable doubt whether the jury has been properly guided in its deliberations.'" *EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1097 (5th Cir. 1994) (quoting *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 425 (5th Cir. 1985)).

The district court charged the jury, in part, with this language:

> The court instructs you that, as a matter of law, the corporate officers and agents of Precision Printing and Anheuser-Busch had a duty under the laws guaranteeing equal opportunity in employment to prevent sexual harassment of employees of the

-10-

company.

> Therefore, if you find that any one or more of the Defendants knew, or reasonably should have known, of intentional sexual harassment that could, or did, inflict severe emotional distress upon female employees, Patricia Skidmore, and other employees of Precision Printing & Packaging Company, and that Defendant, or those Defendants, failed to make a reasonable effort to prevent such sexual harassment, then you may find that the [*sic*] Defendant, or those Defendants[,] liable to the Plaintiff for intentional infliction of emotional distress.

The instruction misstates the law regarding intentional infliction of emotional distress. Under it, the jury could have found Mitchell liable to Skidmore for sexual harassment that *could* have caused severe emotional distress upon "female employees" in general. The instruction ignores that a claim for intentional infliction of emotional distress requires that the plaintiff actually suffer severe distress and that the defendant act intentionally or recklessly. Moreover, the instruction at no place gave an accurate statement of the kind of conduct that the jury would have to find in order to conclude that Mitchell intentionally inflicted emotional distress on Skidmore. Such an erroneous instruction leaves us with substantial doubt whether the jury was properly guided in its deliberations. We are therefore compelled to vacate the verdict against Mitchell for intentional infliction of emotional distress. Consistent with this holding, we remand for a new trial on Skidmore's claim

-11-

against Mitchell based on the state law of intentional infliction of emotional distress.

### III. *Claims Against Precision*

A. *Intentional Infliction of Emotional Distress*

Under Texas law, an employer may be vicariously liable for the intentional tort of its employee under the doctrine of respondeat superior or directly liable under the theory of ratification. Per the interrogatories in this case, the jury found Precision and Anheuser-Busch liable for intentional infliction of emotional distress via the doctrine of ratification, and not respondeat superior. The employer may ratify its employee's conduct through its own acts, conduct, or affirmative acquiescence. *See, e.g.*, *Little v. Clark*, 592 S.W.2d 61, 64 (Tex. Civ. App.--Ft. Worth 1979, writ ref'd n.r.e.). The employer's mere retention of the employee in service will not establish ratification. *See Durand v. Moore*, 879 S.W.2d 196, 203 (Tex. App.--Houston [14th Dist.] 1994, no writ); *Prunty v. Arkansas Freightways, Inc.*, 16 F.3d 649, 653-54 (5th Cir. 1994). Nor will its mere denial of liability. *See Southwestern Bell Telephone Co. v. Wilson*, 768 S.W.2d 755, 764 (Tex. App.--Corpus Christi 1988, writ denied). The employer's failure to repudiate its employee's tortious act may sometimes establish ratification. *See Prunty*, 16 F.3d at 653 (citing *Hinote v. Oil, Chemical and Atomic Workers Union*, 777 S.W.2d 134, 141 (Tex. App.--San Antonio

-12-

1989, writ denied)); *K-Mart No. 4195 v. Judge*, 515 S.W.2d 148, 153, 154 (Tex. Civ. App.--Beaumont 1974, writ dism'd w.o.j.)). In cases of employer silence as ratification, the employer must possess all material facts. *See Southwestern Bell Telephone*, 768 S.W.2d at 764. In the case of intentional infliction of emotional distress, the employer therefore must know enough to realize that the employee's conduct was extreme and outrageous. *See Prunty*, 16 F.3d at 655. The plaintiff bears the burden of proving ratification. *See Southwestern Bell Telephone*, 768 S.W.2d at 764.

Skidmore presented no evidence at trial from which the jury could have concluded that Precision ratified Mitchell's conduct or was otherwise directly liable. Skidmore herself testified that she complained only once to Bryan and never to any other manager. Bryan responded by telling Mitchell to leave Skidmore alone. Even if the plant managers had failed to act on Mitchell's conduct at all, Skidmore presented no evidence suggesting that they possessed all material facts such that their silence could constitute ratification. The district court thus should have granted judgment as a matter of law to Precision on Skidmore's claim for intentional infliction of emotional distress.

B.   *Title VII*

   1.   *Sufficiency of the Evidence*

Skidmore claimed sexual harassment under the theory of a hostile or abusive work environment, as set forth in *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S. Ct. 2399 (1986).  To support such a claim, a plaintiff must establish five elements: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment (3) based upon sex, (4) which affected a term, condition, or privilege of her employment; and (5) that her employer knew, or should have known, of the harassment and failed to take prompt remedial action.  *See Jones v. Flagship International*, 793 F.2d 714, 719-20 (5th Cir. 1986).

Precision argues that Skidmore presented no evidence that Mitchell's conduct was severe and pervasive enough to alter the terms or conditions of her employment.  We disagree.  Skidmore, as well as various co-workers, testified that Mitchell's inappropriate behavior was constant and caused others to ostracize and make fun of Skidmore.

Precision further argues that Skidmore presented no evidence that Precision failed to take prompt remedial action once it knew or should have known of the harassment.  "Prompt remedial action" must be "reasonably calculated" to end the harassment.  *Id.*

> What is appropriate remedial action will
> necessarily depend on the particular facts of
> the case--the severity and persistence of the
> harassment, and the effectiveness of any

-14-

> initial remedial steps. . . . [N]ot every
> response by an employer will be sufficient to
> discharge its legal duty.  Rather, the
> employer may be liable despite having taken
> remedial steps if the plaintiff can establish
> that the employer's response was not
> "reasonably calculated" to halt the
> harassment.

*Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989) (citations omitted).  The plaintiff bears the burden of showing that his employer failed to take effective action.  *See, e.g.*, *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990).  This Court has often found that an employer's response to employee behavior constituted prompt remedial action as a matter of law.  *See Hirras v. National Railroad Passenger Corp.*, 95 F.3d 396, 400 (5th Cir. 1996) (listing cases).  In many such instances, in determining whether the employer's actions were remedial, we have considered whether the offending behavior in fact ceased.  *See, e.g.*, *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) (Jones, J., with two Judges concurring in result) (affirming judgment as a matter of law for an employer who promptly punished the harassing employee, resulting in "complete cessation of harassment"); *Waymire v. Harris County*, 86 F.3d 424, 429 (5th Cir. 1996) (affirming judgment as a matter of law for the defendant who promptly reprimanded the harassing employee, who never harassed the

plaintiff again); *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309-10 (5th Cir. 1987) (reversing judgment for the plaintiff where the employer took decisive action but the plaintiff quit her job too soon for the remedy to have effect). In this case, we hold that Precision's conduct constitutes "prompt remedial action" as a matter of law. Bryan testified that he instructed Mitchell to leave Skidmore alone and moved Skidmore to a new shift. At that point, the hostile work environment terminated. Though Skidmore testified that she remained uncomfortable, Mitchell's conduct ceased its offensive nature. Indeed, Skidmore never registered a further complaint with Bryan or any other manager at Precision. Therefore, Precision's action was "reasonably calculated" to relieve, and in fact did successfully abate, the hostile work environment, despite the fact that Bryan did not conduct any investigation of the allegations until after Skidmore filed an EEOC complaint months later, did not reprimand Mitchell, and made no follow-up inquiry with Skidmore as to whether the harassment had ceased. Thus, the evidence was insufficient to find Precision liable under Title VII, and the district court erred in failing to grant judgment as a matter of law to Precision. Because we dispose of this matter thusly, we need not reach Precision's arguments about defective jury instructions and improper special interrogatories. We also need not reach Precision and Anheuser-Busch's objection to the

punitive damage award under Title VII.

### IV.   *Claims Against Anheuser-Busch*

### A.   *Title VII*

Title VII proscribes certain actions of "employers," "employment agencies," and "labor organizations." 42 U.S.C. § 2000e-2.   In considering whether a corporation related to an employer may be liable under Title VII as a joint employer, the Fifth Circuit follows the four-factor test adopted by the United States Supreme Court in the context of a labor dispute in *Radio Union v. Broadcast Services*, 380 U.S. 255, 257, 85 S. Ct. 876, 877 (1965).   *See Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983) (applying the *Radio Union* test in a civil-rights context)*; see also Garcia v. Elf Atochem North America*, 28 F.3d 446, 450 (5th Cir. 1994) (applying *Trevino* to a Title VII action).

> [T]he rule has emerged that superficially
> distinct entities may be exposed to liability
> upon a finding that they represent a single,
> integrated enterprise: a single employer.
> Factors considered in determining whether
> distinct entities constitute an integrated
> enterprise are (1) interrelation of
> operations, (2) centralized control of labor
> relations, (3) common management, and (4)
> common ownership or financial control.

*Trevino*, 701 F.2d at 404.   Traditionally, the second of these four factors has been considered the most important, such that courts have focused almost exclusively on one question: which

-17-

entity made the final decisions regarding employment matters relating to the person claiming discrimination? *See Schweitzer v. Advanced Telemarketing Corp.*, 104 F.3d 761, 764 (5th Cir. 1997) (citing *Trevino*, 701 F.2d at 404).

Contending that Anheuser-Busch was her and Mitchell's employer for Title VII purposes, Skidmore points to evidence of five points: (1) Anheuser-Busch approved Precision's awards for accident-free work records; (2) Skidmore received a corporate letter of commendation that referred to her as an Anheuser-Busch employee; (3) Anheuser-Busch gave production directives to Precision; (4) an Anheuser-Busch vice-president held meetings with Precision's employee safety team and presided over presentations on expansion and purchase of new presses; and (5) legal counsel at Anheuser-Busch handled Skidmore's EEOC charge and harassment suit.

The evidence to which Skidmore points does not support a finding that Anheuser-Busch was her employer for Title VII purposes. The primary *Trevino* factor concerns which entity made the employment decisions regarding Skidmore. Brian Ashworth, Precision's director of human resources, testified that, although it paid an Anheuser-Busch department to act as third-party administrator of its benefit programs, Precision offered its own employee benefit packages. He testified that Precision hired, fired, promoted, and demoted its own employees without consulting

Anheuser-Busch, and that Precision negotiated its own union contracts without consulting Anheuser-Busch. Skidmore's evidence does not contradict Ashworth's testimony. Nor has Skidmore shown Anheuser-Busch participated in Precision's labor decisions, or that Anheuser-Busch and Precision intermingled their operations and management functions. The district court therefore erred in failing to grant judgment as a matter of law to Anheuser-Busch on Skidmore's claim for sexual harassment.

B. *State Law Claims*

Skidmore presented no evidence that Anheuser-Busch employed Mitchell or ratified his conduct. The district court therefore erred in failing to grant judgment as a matter of law to Anheuser-Busch on Skidmore's claim for intentional infliction of emotional distress.

### V. *Expert Testimony*

Precision complains that the district court erred in admitting the expert testimony of Dr. Roger House, a psychiatrist who evaluated Skidmore. Dr. House testified to his diagnosis that Skidmore suffered from post-traumatic stress disorder and depression brought on by Mitchell's conduct. We review for abuse of discretion the district court's decision to admit the expert testimony. *See Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 274 (5th Cir. 1998) (en banc) (citing *General Electric Co. v. Joiner*,

-19-

522 U.S. 136, 118 S. Ct. 512 (1997)).

Precision first argues that the district court admitted House's testimony without requiring the establishment of a proper foundation under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993). Under *Daubert*, the district court makes a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can be applied to the facts at issue." *Id*. at 592-93, 113 S. Ct. at 2796. Many factors may bear on this inquiry, for example whether a scientific technique has been subjected to peer review and whether it has received general acceptance. *See id*. at 593-94, 113 S. Ct. at 2796-97. This so-called "gate-keeping" obligation applies to all types of expert testimony, not just "scientific" testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, -- U.S. --, 119 S. Ct. 1167, 1174 (1999). But whether *Daubert*'s suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. *Id*. at 1174-76 (1999). It is a fact-specific inquiry. *See Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999). The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of

-20-

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo*, 119 S. Ct. at 1176.  The district court in this case did not deviate from that standard.  Dr. House testified to his experience, to the criteria by which he diagnosed Skidmore, and to standard methods of diagnosis in his field.  Absent any indication that Dr. House's testimony amounted to the sort of "junk science" *Daubert* blocks, we see no abuse of discretion in the district court's admitting the testimony.

Next, Precision argues that Dr. House should not have been allowed to testify to Skidmore's credibility.  Dr. House testified that he did not think Skidmore had lied to him or fabricated her psychiatric symptoms.  Credibility determinations, of course, fall within the jury's province.  *See, e.g.*, *Ray v. Iuka Special Municipal Separate School District*, 51 F.3d 1246, 1251 (5th Cir. 1995); *Boeing Co. v. Shipman*, 411 F.2d 365, 377 (5th Cir. 1969) (en banc).  Nonetheless, Dr. House in no way testified that Skidmore was undoubtedly telling the truth; instead, he merely opined that her symptoms and recollections appeared genuine and that he felt he had not been "duped" by her. We see no abuse of discretion in the district court allowing a psychiatrist to testify that a plaintiff seems genuinely distressed to him.

Finally, Precision states that Skidmore's own testimony-- namely, that she began having nightmares long after the alleged

harassment ended--contradicted the facts upon which Dr. House said he relied.  Because of this, Precision argues, Dr. House's testimony was not based on reliable data and should not have been admitted.  We disagree.  "The facts . . . in the particular cases upon which an expert bases an opinion or inference may be those perceived by . . . the expert at or before the hearing." Fed. R. Evid. 703.  The expert may be required to disclose the underlying facts upon which he relied, *see* Fed. R. Evid. 705, and Dr. House did just that.  The jury was then free to credit or not to credit Dr. House's testimony and diagnosis.  *See, e.g.*, *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir. 1993) ("[I]t ordinarily is the province of the jury to gauge the expert witness[']s credibility and the reliability of his data.").

### VI.  *Damages*

The district court held Precision, Anheuser-Busch, and Mitchell jointly and severally liable for $30,000 in compensatory damages.  The interrogatories given to the jury allowed no opportunity to allocate damages between Skidmore's Title VII and state law claims.  Moreover, neither Precision nor Anheuser-Busch should have been held liable for damages on any claimss.  We therefore vacate the award as to Mitchell and reverse the award as to Precision and Anheuser-Busch.   What damages Mitchell owes will be determined at a new trial on the intentional infliction of emotional distress question.

## VII. *Attorneys' Fees*

Precision argues that the district court abused its discretion when it awarded attorneys' fees to Skidmore. We review the district court's grant of attorneys' fees for abuse of discretion. *See League of United Latin American Citizens v. Roscoe ISD*, 119 F.3d 1228, 1232 (5th Cir. 1997).

Generally, entitlement to attorneys' fees in this type of action is predicated on the recovery of actual damages for the federal claim. *See Farrar v. Hobby*, 506 U.S. 103, 115, 113 S. Ct. 566, 575 (1992); *Johnson v. Eaton*, 80 F.3d 148, 152 (5th Cir. 1996). Because we hold, as a matter of law, that Skidmore is not entitled to recover on the Title VII claim, she is likewise not entitled to any attorneys' fees at all. We therefore find that the district court abused its discretion and reverse the award of attorneys' fees.

## VIII. *Conclusion*

The judgment against Mitchell for intentional infliction of emotional distress is VACATED based on the misleading jury instruction and the cause REMANDED for a new trial.

The judgment against Precision for intentional infliction of emotional distress and a violation of Title VII is REVERSED and REMANDED with instructions to dismiss the claims.

The judgments against Anheuser-Busch are REVERSED on all claims and REMANDED with instructions to dismiss the claims.

-23-

The attorneys' fee award based on Skidmore's Title VII claim is REVERSED and REMANDED with instructions to dismiss the claim.

REVERSED in part, VACATED and REMANDED in part.