Molly HARVILL, Plaintiff,

v.

WESTWARD COMMUNICATIONS,
LLC, et al, Defendants.

No. 6:02 CV 511.

United States District Court,
E.D. Texas,
Tyler Division.

March 25, 2004.

574

Alex Arthur Castetter, Stuckey Garrigan & Castetter, Nacogdoches, for Molly Harvill, Plaintiff.

Felicity Anne Fowler, Haynes & Boone, Houston, for Westward Communications LLC, Westward Communications LP, Westward General LLC, Oscar Rogers, Defendants.

James Scott Howard, Brown McCarroll, Longview, for Molly Harvill, Plaintiff.

Louis Charles Edmond Van Cleef, Holmes Law Office, Longview, for Westward Communications LLC, Westward Communications LP, Westward General LLC, Oscar Rogers, Defendants.

## ORDER ON SUMMARY JUDGMENT

STEGER, District Judge.

Came on this day for consideration the *Defendants' Motion for Summary Judgment* (Docket No. 31). After careful consideration, the Court is of the opinion that the following order shall issue.

### BACKGROUND AND PROCEDURAL HISTORY

The Plaintiff in this case, Molly Harvill ("Harvill") filed the instant lawsuit against her former employer, Westward Communications, L.L.C. ("Westward") for sexual harassment at the hands of Oscar Rogers ("Rogers"), a coworker.

Westward Communications[1] owns approximately sixteen community newspapers in East Texas, including the Grand Saline Sun, the Wood County Democrat, and the Edgewood Enterprise. For the majority of the newspapers, there is a publisher who is responsible for the day-to-day operations and staff, editorial staff who write and edit the stories, sales staff who sell advertising for the paper, composition personnel who layout the paper, and an office manager.

During all times relevant to Harvill's lawsuit allegations, Nell French ("French") has been the Publisher of the Grand Saline Sun, Wood County Democrat, and Edgewood Enterprise, and Oscar Rogers has run a commercial printing press from the back of the Grand Saline office. Additionally, Aggie McDonald ("McDonald") is the Composition or Graphics Designer.

On January 20, 2001, French hired Harvill as the Office Manager for the Grand Saline Sun. Harvill's duties included processing bills for the office and print shop, answering the telephones, and other office-related duties.

When Harvill began her employment, Westward provided her with a copy of the Employee Handbook, which contains it's anti-harassment policy. Moreover, on March 14, 2001, Harvill participated in a new hire orientation taught by Fisher, Director of Human Resources. During this training, Fisher explained, among other things, the anti-harassment policy and covered the anti-harassment reporting procedures. Under Westward's anti-harassment policy, Westward forbids any form of discrimination, including sexual or other unlawful harassment in the workplace. If an employee feels that he or she has been

---

1. Defendants refer to Westward Communications, L.P. as "Westward Communications." On September 30, 2001, the Company made a business decision to convert from an L.L.C. to an L.P. Thus, Harvill was employed by Westward Communications, L.L.C. until the conversion date. At that time, she became employed by Westward Communications, L.P. Westward General, L.L.C. is a general partner to the L.P. It never employed Harvill and Harvill never performed any work-related services for the Westward General, L.L.C. entity.

subjected to harassment of any kind, Westward's policy maintains that the incident must be reported promptly to his or her immediate supervisor. If the employee feels that it would be inappropriate to report the matter to the immediate supervisor, or if the matter is not satisfactorily resolved at this level, the employee is to report the incident directly to the Director of Human Resources. The anti-harassment policy states:

> If an employee feels that he or she is being subjected to harassment of any kind, the incident(s) must be reported promptly to his/her immediate supervisor. If the employee feels that it would be inappropriate to report the matter to the immediate supervisor, or the matter is not satisfactorily resolved at this level, the employee should report the incident(s) directly to the Director, Human Resources at 440–746–1701.

On March 14, 2001, Harvill acknowledged receiving the anti-harassment training during the new hire orientation and, on July 23, 2001, Harvill acknowledged receiving and understanding the Westward Employee Handbook.

On October 11, 2001, approximately 10 months into Harvill's employment with the Company, Harvill, along with a co-worker, Allison Hockman ("Hockman"), approached French and lodged allegations of sexual harassment by Rogers. During this meeting, Harvill claims that she told French that Rogers had grabbed her breasts, patted her behind, and attempted to kiss her on the cheek. According to the Plaintiff, on some occasion prior to October 11, 2001, Harvill stated to Hockman and McDonald that Rogers was "at it again," which prompted a discussion where McDonald and Hockman allegedly replied that they had also "been done that way." Harvill claims that McDonald told them that Rogers had "hunched her like a dog." After recounting this meeting with Mc-

Donald and Hockman, Harvill informed French that she had "all that she could handle." Harvill claims that French then referred her to an anti-harassment policy over the copier in the layout room. In turn, Harvill asserts that French then asked her what she wanted her to do, and Harvill replied: "Do whatever your job requires you to do."

Immediately after receiving Harvill's allegations of harassment by Rogers, French investigated the matter. French contacted other Westward employees who had work experience with Rogers. French talked to Jana Stovall ("Stovall"), Doris Newman ("Newman"), Kiki Robinson ("Robinson"), Joyce Hathcock ("Hathcock"), and an individual known as "Floydel" about their personal knowledge of Rogers' behavior and whether they had observed any inappropriate behavior. Additionally, French contacted Jim Bardwell ("Bardwell"), a prior Publisher, to find out whether he was aware of any misconduct or inappropriate behavior during his employment with Rogers. None of these individuals corroborated Harvill's harassment allegations or otherwise stated that Rogers had engaged in any sexually inappropriate behavior at Westward.

Thereafter, on approximately October 23, 2001, French met with McDonald. During that meeting, French explained that Harvill claimed that McDonald would corroborate her allegations of sexual harassment by Rogers. McDonald stated that she did not want anything to do with it and stated that she would not support Harvill's allegations. French concluded that McDonald did not believe Harvill's allegations. McDonald had not experienced, and was unaware of, Rogers engaging in sexually inappropriate behavior.

Following the October 11, 2001 meeting with French, Harvill asserts that Rogers again harassed her by popping rubber

bands at her, brushing up against her breasts, and patting her on the behind. On two or three other occasions, when this alleged harassment continued, Harvill contacted French and told her that "it was continuing on." On one occasion, Harvill contacted French on the telephone after Rogers "patted her on the butt."

On February 19, 2002, the Defendants received a letter from an attorney on behalf of Harvill that stated her intent to file an EEOC charge claiming sexual harassment by Rogers. Fisher began an investigation. On February 20, 2002, Fisher contacted Harvill and informed Harvill that she was aware of her allegations of harassment. Harvill stated that she was not going to participate in any investigation. Harvill told Fisher that she would have to speak to her attorney. That same day, Fisher contacted French. French explained to Fisher that Harvill never reported the allegations in her attorney's letter of an attempted kiss or touchings of Harvill's breasts or buttock by Rogers. Rather, French recounted that Harvill's only "complaint" was that Rogers had accidentally brushed up against her twice, but apologized. French also explained to Fisher that Harvill never wanted to pursue a complaint.

Additionally, on February 20, 2002, Fisher contacted McDonald. During her interview with McDonald, McDonald maintained that she had not been harassed by Rogers. McDonald did inform Fisher that, over ten years ago, Rogers accidentally brushed up against her. Nevertheless, she did not consider this to be inappropriate. She did not witness any harassment by Rogers and claimed that Rogers is a friendly person who she will exchange hugs or pats on the back with, but nothing that would constitute harassment. Thereafter, Fisher contacted Bill Holder ("Holder"), Regional Vice President, and informed him that he needed to be present when she arranged a telephone interview with Rogers later that day.

When Rogers returned to the Grand Saline Sun on February 20th, Holder informed him that he needed to come inside and speak to Fisher. Rogers accompanied Holder into the Editor's office where Fisher proceeded to speak to Rogers over the telephone. Fisher stated that Harvill and Hockman alleged that he had sexually harassed them. To this, Rogers stated emphatically that he had never harassed either individual, that he would take a polygraph exam right then, and that Westward could conduct any background or security check on him.

The next day, Fisher contacted the Plaintiff's attorney in an attempt to set up an interview with Harvill. Harvill agreed to speak to Fisher by phone from her attorney's office. During this interview, Harvill claimed that Rogers had attempted to kiss her when he had returned from a vacation in July 2001, that he touched her breasts or "behind" 5 to 6 times from July to October of 2001, and since October 2001, he bumped her breasts and said "sorry" two or three times. Harvill reiterated that she told French to "do whatever she needed to do." Fisher inquired as to why Harvill never contacted her after the October 2001 "complaint" to French. Harvill explained that she did not think she could contact Fisher because French had told her "never to go over her head on anything."

While Fisher was just beginning her investigation, the Defendants decided to separate Rogers from both Hockman and Harvill. French provided Rogers with a memorandum in which the Company forbid him from having any communication with Harvill until the investigation was completed. Rogers was to go through French, McDonald, or a new assistant publisher, Wilbur Callaway, if he needed to

exchange work-related paperwork with Harvill. Further, French instructed Rogers to enter through only the back door of the building and keep the door in between the commercial printing press and the front of the office closed at all times.

Fisher continued her investigation on February 28, 2002 by further interviewing French and Rogers. During Rogers' conversation with Fisher, he explained to Fisher that he did not, during his employment, attempt to have any social contact with Harvill because he had determined, based on his own past experiences as an African–American, that she was prejudiced. Further, Rogers provided various witnesses that he claimed would testify as to his character, including Shirley Yarborough ("Yarborough"), Fern Woodall ("Woodall"), Sheila Ledesma ("Ledesma"), Jan Adamson ("Adamson"), and Melissa Allen ("Allen").

From March 1 through March 4, 2002, Fisher conducted various interviews with Yarborough, Adamson, and other current or former employees. Adamson, a previous Grand Saline Publisher, suggested that Fisher contact former employees Leah Mosley ("Mosley") and Donna Limberger ("Limberger"). After several attempts, Fisher was unable to contact Limberger, but did interview Mosley. Additionally, Fisher noted that a Westward employee, Cynthia Moore ("Moore"), had a recent short tenure at the Grand Saline Sun and, in turn, Fisher decided to interview Moore to inquire if Moore left because of Rogers. Through these interviews, Fisher determined that there was no corroborating evidence of past harassment or inappropriate sexual behavior by Rogers. All of these witnesses denied observing or being made aware of sexually inappropriate behavior by Rogers. The only incident of potentially inappropriate behavior was a comment by Adamson that some seven or eight years ago Rog-

ers made innuendos at the workplace. Yet, Adamson explained to Fisher that *all* of the employees were "raunchy in the office."

On March 6, Fisher contacted French. French stated to Fisher that Harvill had used the word "nigger" to describe Rogers around the time period of her October 2001 meeting with Harvill. On March 13, 2002, Fisher met, via telephone, with Rogers and French. During this meeting, Fisher explained that she had determined Harvill's allegations of harassment to be inconclusive. Nevertheless, Fisher warned Rogers that any sexually inappropriate activity in the work place was strictly prohibited. Fisher explained to Rogers that, out of an abundance of caution, he was not to "engage in physical contact in the form of hugs, arm around the shoulder, or the like." Fisher also cautioned Rogers to keep his contact with Harvill infrequent and continue to go through McDonald as he had been instructed on February 27, 2002. As part of her warning, Fisher had Rogers re-read and sign the anti-harassment policy.

On March 19, 2002, Fisher arranged for a telephone conference with Harvill in which French was present. During that conversation, Fisher explained that she had concluded her investigation and found Hockman and Harvill's allegations of harassment to be inconclusive. Fisher, through French, provided a written explanation of the investigation to Harvill. Further, Fisher explained Rogers had completely denied her allegations and no other witnesses, outside of Hockman, had corroborated her allegations or otherwise provided information of sexually inappropriate behavior by Rogers. Fisher also informed Harvill that there were allegations of racial comments being made by Harvill regarding Rogers. Fisher explained that her investigation into these

allegations had also been inconclusive, but issued Harvill a warning not to engage in racially inappropriate behavior at the workplace. As part of this warning, Fisher had Harvill sign an acknowledgement of the anti-harassment policy.

On March 25, 2002, Harvill requested leave under the Family Medical Leave Act ("FMLA"), stating to Fisher that she was stressed because of work. On that same day, Fisher sent Harvill the FMLA paperwork and informed Harvill that she qualified for FMLA. Fisher informed Harvill that FMLA leave protected her job and that her benefits would continue at the regular employee rate and that her leave was FMLA leave. Shortly thereafter, Harvill tendered a letter of resignation accompanied with a statement from a Dr. Martinez that she could no longer work in the Grand Saline office because of her health.

In February 2002, before the Company completed its investigation into Harvill's harassment allegations, Harvill filed a claim with the EEOC. In her charge, she alleged sexual harassment by Rogers. On July 25, 2002, the EEOC issued a determination letter and informed Harvill's counsel, Howard, that "there was insufficient evidence to show that Respondent discriminated against your clients." Thereafter, on October 23, 2002, Harvill filed the instant cause of action against Westward and Rogers in which she alleged: sexual harassment, retaliation, unpaid overtime, and constructive discharge against the Westward Defendants, and assault and battery and intentional infliction of emotional distress against Rogers.

### STANDARD OF REVIEW

A party is entitled to summary judgment on all or any part of a claim "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party must show initially that there is no genuine issue of any material fact. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. The movant may meet this burden by pointing out the absence of evidence supporting any essential element of the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In deciding whether to grant a motion for summary judgment, the Court "review[s] the evidence and inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991) (citing *Duvall v. The Ritz Carlton Hotel Co.*, 946 F.2d 418, 420 (5th Cir.1991), and quoting Fed.R.Civ.P. 56(c)). An issue is "genuine" only if the evidence could lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Price*, 975 F.2d 231, 235 (5th Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. at 2513).

The opposing party may not rest on the mere allegations or denials of artful pleading, but must set forth affirmative facts that show a genuine issue for trial. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. This requires that the non-moving party make a showing sufficient to establish the existence of any element essential to that party's case, and on which that party will bear the burden at trial. *Nowlin v. R.T.C.*, 33 F.3d 498, 501 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–553).

### A. Co–Worker Sexual Harassment

 Title VII of the Civil Rights Act of 1964 states: "it shall be an unlawful em-

ployment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of ... sex." 42 U.S.C. § 2000e–2(a)(1) (2001). Under Fifth Circuit precedent, to establish her *prima facie* case for co-worker sexual harassment, the Plaintiff must prove:

(1) she belongs to a protected group;

(2) she was subjected to unwelcome harassment;

(3) the harassment was based on sex;

(4) the harassment affected a "term, condition or privilege of the employment;" and

(5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). The Defendants challenge the last two elements of the Plaintiff's *prima facie* case of harassment.

*Severity*

■ Taking the Plaintiff's allegations as true, the first issue then is whether Rogers' alleged harassment was so severe and pervasive that it altered the terms and conditions of her employment. The Plaintiff, at this juncture, must present evidence of an objectively and subjectively abusive work environment. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To determine whether a harassment plaintiff has established the existence of an objectively hostile environment, courts review "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

■ Courts have set a high standard for what constitutes severe and pervasive harassment: "Title VII was only meant to bar conduct that is so severe and pervasive that it destroys a protected class members opportunity to succeed in the workplace." *Weller,* 84 F.3d at 194. Under this rigorous standard, Harvill cannot prevail on her claim that Rogers' alleged conduct was severe and pervasive.

According to Harvill, the alleged harassment began in July 2001 when Rogers attempted to grab hold of her to kiss her on the cheek after she told him that she was glad that he had returned from his vacation. Thereafter, Harvill claims that on "numerous occasions" Rogers would brush up against her breasts or body. Additionally, Harvill alleged numerous touchings or pattings on her behind. Harvill also asserts that Rogers would harass her by shooting rubber bands at her and, that on at least one occasion, he was aiming for her breasts with a rubber band. Finally, Harvill maintains that in the summer of 2001, an air conditioner repairman, Ricky Ramirez, with whom Harvill had dated in the past, had a discussion with Rogers. Following this discussion, Rogers stated to Harvill that Ramirez said to him that Harvill was "good in bed." These allegations fail to rise to the Fifth Circuit's stringent standard for establishing severe and pervasive conduct. *See, e.g., Shepherd v. Comptroller of Pub. Accounts,* 168 F.3d 871, 873 (5th Cir.), *cert. denied,* 528 U.S. 963, 120 S.Ct. 395, 145 L.Ed.2d 308 (1999) (finding that several inappropriate comments, including "your elbows are the same color as your nipples," and touchings, including rubbing his hands down her arm from her shoulder to her wrist, which occurred over the course of two years, were "boorish and offensive" but were not objectively severe or pervasive enough to constitute actionable sexual harassment); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d

333, 337 (7th Cir.1993) (finding that conduct that included attempting to kiss plaintiff once at bar and twice at work, several incidents of unwanted touching, placing "I love you" signs in her work area and asking her out on dates were not sufficient for actionable harassment).

Harvill next alleges "numerous" breasts touchings and "butt pattings," but does not specify, beyond these conclusory statements, any details behind these "numerous" touchings. Similarly, when asked to describe her "butt touchings," Harvill also claimed "numerous." Such conclusory allegations preclude a fact finder from determining the "totality of the circumstances" required to evaluate severe and pervasive conduct and, hence, fail to create an issue of material fact. *See Harris v. Carrollton,* 2002 WL 31697726, at *3 (N.D.Tex. Nov.27, 2002) (finding that "[t]he conduct attributed to [Defendant] is conclusory in the extreme, thus foreclosing a fact-finder's ability to weigh the totality of the circumstances in which his remarks were made.") Thus, Harvill's allegations of "numerous touchings or fondlings" and "numerous butt grabbings" are too conclusory as to create an issue of material fact on her harassment claim.

Regarding the "rubber band" incident, such conduct, even in the light most favorable to Harvill, is akin to nothing more than inappropriate horseplay that fails to constitute objective harassment. In *Oncale,* the Supreme Court warned that Title VII is not intended to convert "horseplay" into conduct which creates discriminatory conditions of employment. *Oncale,* 118 S.Ct. at 1003. The Court explained that: "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Id.* Plainly, flinging a rubber band, even if aimed at Harvill's breasts, falls into the category of simple teasing or rough-housing rather than sexually severe and pervasive conduct.

The Court finds that Harvill's allegations fail to constitute an objectively severe and pervasive hostile work environment. Even when taken together, the courts have uniformly found, as a matter of law, that such conduct does not constitute harassment under Title VII.

It is certainly true that Roger's alleged conduct was immature, unprofessional, offensive, and inappropriate, but it is not the type of behavior that Title VII is designed to prevent. Because the Plaintiff has failed to meet her burden of proving that Roger's alleged conduct was so severe and pervasive that it altered the terms and conditions of her employment, the Court must dismiss this cause of action.

***Prompt Remedial Action***

■ Although the Plaintiff's failure to establish the severity of Roger's conduct is fatal to her co-worker harassment claim, the Court will also address the Defendants' contention that they took prompt remedial action. In Title VII sexual harassment cases where the alleged harasser is a supervisor, an employer may assert the following affirmative defense: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

■ Although this is not a supervisor liability case, the second prong of the affirmative defense is instructive to our co-worker harassment charge. In *Woods v. Delta Beverage Group, Inc.,* 274 F.3d 295,

300 n. 3 (5th Cir.2001), the Fifth Circuit concluded that, as in a supervisory harassment case, the plaintiff's unreasonable failure to take advantage of the company's corrective opportunities was instructive in a co-worker harassment suit. To satisfy the fifth element of her *prima facie* case, the Plaintiff needs to show that she reasonably took advantage of the corrective opportunities provided by her employer. *Id.*

■ Where measures abate harassment, they are prompt and remedial as a matter of law and prevent a party from raising an issue of material fact on her co-worker sexual harassment claim. *See Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir.1999).

In this case, the Defendant did investigate in October 2001 and initially concluded that Harvill's harassment allegations lacked merit. Although this determination apparently displeased the Plaintiff, she did not act reasonably in not taking her complaint to Fisher, the Director of Human Resources. Under Westward's policy, if an employee's complaint is not "satisfactorily resolved" at the supervisor level, the employee should report the incident directly to the Director of Human Resources. Here, Harvill clearly failed to use this bypass mechanism and she does not contest Defendants' summary judgment authority that such failure to do so is unreasonable. The Plaintiff's unreasonable actions prevent her from establishing that Defendants did not respond with prompt and remedial measures. *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 300 (5th Cir.2001). Eventually, when she did use the bypass procedure, it is undisputed that the Company's response was effective. Harvill concedes the alleged harassment ended when she reported her allegations to Fisher in February 2002.

Accordingly, the Court finds that the Plaintiff unreasonably failed to take advantage of the company's corrective opportunities afforded her above the supervisory level. Further, the Court finds that once Fisher learned of the Plaintiff's complaints, Defendants exercised reasonable care and acted promptly to correct any sexual harassment. As the Plaintiff has failed to prevail on this element as well, the Court finds that the Plaintiff fails to establish her *prima facie* case of hostile work environment sexual harassment as a matter of law.

## B. *FLSA Overtime Claim*

■ The Plaintiff claims that Westward failed to compensate her for hours worked in excess of 40 hours a week. The Defendants move for summary judgment on this claim, averring that she has produced no evidence of their knowledge of her alleged overtime.

■ Under the FLSA, no employer shall employ any of its covered employees for a work week that is longer than 40 hours unless that employee receives as compensation for his employment at least one and a half times the regular rate for all overtime hours. 29 U.S.C. § 207(a). Thus, an employer who knows or should know that an employee is or was working overtime must comply with the provisions of § 207(a). *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir.1995). However, where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is *not* a violation of § 207(a). *Newton*, 47 F.3d at 748; *Forrester v. Roth's IGA Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir.1981). The Plaintiff must prove "with definite and certain evidence" that she was not properly compensated for work performed. *Reeves*

v. *Intl. Tel. and Tel. Corp.*, 616 F.2d 1342, 1351 (5th Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981).

The Plaintiff asserts that she was denied overtime pay over the entire course of her Westward employment, but has not calculated how much she is allegedly owed. She claims that she would keep separate time sheets of what she actually worked and would only turn in 8:00 to 5:00 time sheets to French because French told her to do so. The Defendants do not allow overtime unless it is authorized, and, according to her deposition, Harvill knew that her overtime was not sanctioned. Westward employees, however, are allowed to take, as "flex time" (time-off at the end of the week), if they worked hours beyond an eight hour work day previously in the week. This is only allowed, however, within a work-week—employees cannot carry-over this flex time. Harvill maintains that she kept a log of her flex time that she was owed for working over eight hour work days and accumulated that amount over time. Harvill then asserts that she complained to French and co-workers Shane Gilbreath, Al Rowe, and McDonald that she was not getting her flex time. Harvill claims that French authorized the flex time because French knew she was there working at the Grand Saline Sun and, therefore, must have known that she was working overtime.

In *Newton v. City of Henderson,* 47 F.3d at 746, an undercover police officer for the City of Henderson sued for overtime compensation under the FLSA claiming he routinely worked overtime without listing it on his time sheet and without authorization from his employer. *Id.* at 747–48. Newton contended that his supervisors had constructive knowledge of his overtime work because he reported his activities to them daily. *Id.* at 748–50. In that case, Newton's supervisor specifically informed Newton not to work overtime. *Id.* at 749.

The *Newton* court found that constructive knowledge of overtime work could not be imputed to the City, observing:

> In light of the fact that Freeman explicitly ordered Newton not to work overtime and in light of the fact that Newton admits he never demanded payment for overtime already worked, it is clear that access to information regarding the Task Force's activities, standing alone, is insufficient to support the conclusion that the City should have known that Newton was working overtime.

*Id.*

In the case *sub judice,* French instructed Harvill not to work overtime. Even if Harvill discussed her remaining flex time with French, she did not make any demand for overtime pay. Further, just because French may have worked on days at the Grand Saline Sun when Harvill allegedly worked overtime, this is insufficient evidence that French knew the hours that Harvill actually worked. *Id.* French did not have personal knowledge of what hours Harvill worked, and she was generally only present at the Grand Saline Sun office once a week.

Under Westward's policy, if Harvill was improperly working and not being compensated, she was required to report to Fisher. Harvill concedes that she never complained to Fisher. Thus, as in *Newton,* Westward cannot be imputed to have constructive knowledge of any allegedly unpaid overtime. *Newton,* 47 F.3d at 749–50; *see also Uhler v. Galesi Mgmt. Corp.,* 1999 WL 20949, at *5–*7 (N.D.Tex. Jan.8, 1999) (granting summary judgment for defendant employer on a FLSA claim when plaintiff's complaint was supported by general allegations that defendant knew of overtime hours, plaintiff did not record any overtime on his time sheets, and plaintiff never complained prior to termination that

he was working beyond the time recorded on his sheets).

██ In response to the Defendants' motion for summary judgment on this matter, the Plaintiff states: "It is up to the jury to decide who is telling the truth." *See Plaintiff's Response* (Docket No.38). While it is true that the jury functions as the finder of fact during the trial phase of litigation, the Court notes that this case is in the summary judgment stage. Therefore, it is up to Harvill to prove "with definite and certain evidence" that she was not properly compensated for work performed. *Reeves v. Intl. Tel. and Tel. Corp.,* 616 F.2d 1342, 1351 (5th Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981).

The Plaintiff has failed to present sufficient evidence to the Court concerning alleged illegal overtime or knowledge of the same on behalf of the Defendant. Accordingly, this cause of action must also be dismissed.

### C. Constructive Discharge

██ The Defendants first move for summary judgment on the Plaintiff's constructive discharge claim because it falls outside the scope of her EEOC charge. In her Complaint, Harvill alleges for the first time that she was constructively discharged in that she was forced to quit because of the alleged harassment by Rogers.

██ Under Title VII, courts do not have jurisdiction to consider claims lodged under this statute when the aggrieved party has not first exhausted her administrative remedies by filing a discrimination charge with the EEOC. *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995). Further, a civil lawsuit filed under Title VII is "limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970). Failure to assert a claim in the charge or its lack of development in the course of a reasonable investigation of the charge precludes a plaintiff from later lodging the claim in a civil suit. *National Ass'n of Gov't Employees v. City Public Service Bd. of San Antonio,* 40 F.3d 698, 711–12 (5th Cir. 1994).

██ These jurisdictional standards preclude the Plaintiff's constructive discharge claim. It is undisputed that Harvill did not assert constructive discharge in her charge. The charge only contains harassment allegations regarding the terms and conditions of Harvill's employment. Constructive discharge, however, does not grow out of harassment allegations. *Winegarner v. Dallas County Schools,* 1999 WL 325028, at \*2 (N.D.Tex. May 19, 1999) (holding that treatment on the job and constructive discharge are separate and distinct discriminatory events; thus, constructive discharge claim was beyond scope of the charge) (citing *Chester v. American Telephone and Telegraph Co.,* 907 F.Supp. 982, 987 (N.D.Tex.1994), *aff'd,* 68 F.3d 470 (5th Cir.1995), *cert. denied,* 516 U.S. 1141, 116 S.Ct. 974, 133 L.Ed.2d 894 (1996)).

Having failed to first exhaust her administrative remedies before the EEOC, Harvill cannot debut her constructive discharge claim in this court. *See Henderson v. New York Life, Inc.,* 991 F.Supp. 527, 542 (N.D.Tex.1997). Accordingly, this cause of action must be dismissed.

██ The Court pauses to hold that the Plaintiff has failed to present sufficient evidence of a constructive discharge claim even if she were not procedurally barred. To prove constructive discharge, the Plaintiff must establish that the working conditions at Westward "were so intolerable that a reasonable employee in her position would [have felt] compelled to re-

sign." *Webb v. Cardiothoracic Surgery Assoc. of N. Tex.*, 139 F.3d 532, 539 (5th Cir.1998). Allegations of harassment alone are insufficient to constitute constructive discharge. *See, e.g., Taylor v. Texas Dep't. of Crim. Justice—Inst. Div.*, 2000 WL 528410, at *6 (N.D.Tex. May 1, 2000) (finding that harassment allegations alone did not support constructive discharge claim). In order to show constructive discharge in a sexual harassment case, Harvill must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment. Namely, the Fifth Circuit requires the presence of "aggravating factors" to justify a departure from the employer:

(1) demotion;

(2) reduction in salary;

(3) reduction in job responsibilities;

(4) reassignment to menial or degrading work;

(5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or

(6) offers of early retirement on terms that would make the employee worse off whether the offer was accepted or not.

*Barrow v. New Orleans Steamship Ass'n*, 10 F.3d 292, 297 (5th Cir.1994).

The Plaintiff claims that she was constructively discharged based on the following:

(1) a Callaway statement regarding getting a bonus for "running her off";

(2) a "bogus" racial harassment complaint was alleged against her;

(3) an unknown person began taking pictures of her; and

(4) employees treated her "in a hostile manner."

*See generally Plaintiff's Complaint* (Docket No. 1).

These factors, even when viewed in a light most favorable to the Plaintiff, fail to illustrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.

 Further, the Defendants' prompt and remedial measures are fatal to Harvill's constructive discharge claim. *See Webb*, 139 F.3d at 539–40. Likewise, failing to provide the company with a sufficient opportunity to correct the alleged harassment dooms a constructive discharge claim. *See Landgraf v. USI Film Prod.*, 968 F.2d 427, 430–31 (5th Cir.1992) (stating that "a reasonable employee would not have felt compelled to resign immediately following the institution of measures . . . reasonably calculated to stop the harassment.").

The Plaintiff admits that the harassment ended after her attorney contacted Fisher in February 2002. Thereafter, Westward separated Rogers from Harvill and forbid him from having any communication with Harvill until the Company concluded its investigation. Approximately three weeks later, Harvill tendered her resignation.

For the reasons already stated above, the Court agrees that the Defendant instituted prompt remedial measures that were reasonably calculated to end all harassment. Thus, the Court dismisses the Plaintiff's constructive discharge claims on this ground as well.

### D. Retaliation

Initially, the Plaintiff claimed that the Defendants retaliated against her by discouraging other employers from hiring her. After the Defendants filed their motion for summary judgment, the Plaintiff apparently saw the futility of this argument and then bootstrapped her retaliation cause of action to her claim of constructive discharge. Stated another way, the Plain-

tiff now claims that the Defendants retaliated against her by forcing her to resign. The Court's ruling on the Plaintiff's constructive discharge claim is equally fatal to her retaliation cause of action. Since the Court holds that the Plaintiff was not constructively discharged, her retaliation claim fails as a matter of law.

### E. State–Law Claims

 When all federal claims are eliminated from a case prior to trial, the general rule is that the federal court should decline to exercise jurisdiction over pendent state law claims. *McClelland v. Gronwaldt,* 155 F.3d 507, 519 (5th Cir. 1998). In determining whether to retain jurisdiction over the state law claims, the court considers the provisions of 28 U.S.C. § 1367(c) and issues of judicial economy, convenience, fairness, and comity. *Jones v. Adam's Mark Hotel,* 840 F.Supp. 66, 69 (S.D.Tex.1993). For the reasons previously stated above, the Court has dismissed all of the Plaintiff's causes of action of which it had original jurisdiction, leaving various state-law claims. The Court hereby declines to retain supplemental jurisdiction over said claims. All remaining state-law causes of action are hereby dismissed for lack of jurisdiction.

It is therefore

**ORDERED** that the *Defendants' Motion for Summary Judgment* (Docket No. 31) is hereby **GRANTED.** The Plaintiff's federal causes of action against all Defendants are hereby **DISMISSED** for the reasons stated herein.

It is further

**ORDERED** that the Plaintiff's state-law causes of action are hereby **DISMISSED** for the reasons stated herein.

It is therefore

**ORDERED** that all relief requested and not specifically granted is hereby **DENIED.**

It is further

**ORDERED** that all pending motions in this case are hereby **DENIED AS MOOT.**

It is further

**ORDERED** that each party shall bear its own costs and fees.

It is further

**ORDERED** that this case is **CLOSED.**